Slip Op. 08-144

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
CORUS STAAL BV,                         :
                                        :
            Plaintiff,                  :
                                        :
     v.                                 :
                                        :
UNITED STATES and                       :
UNITES STATES DEPARTMENT                :    Before: Judith M. Barzilay, Judge
OF COMMERCE,                            :    Court No. 07-00221
                                        :
            Defendants,                 :
                                        :
     and                                :
                                        :
UNITED STATES STEEL                     :
CORPORATION and                         :
ARCELORMITTAL USA INC.,                 :
                                        :
            Defendant-Intervenors.      :
_____:


OPINION AND ORDER


[Plaintiff's Motion for Judgment upon the Agency Record is granted in part and denied in part.]


                                   Dated:  December 29, 2008


*Steptoe & Johnson LLP*, (*Joel D. Kaufman*), *Richard O. Cunningham*, *Alice A. Kipel*, and *Jamie B. Beaber* for Plaintiff.

*Gregory G.Kastas*, Assistant Attorney General; *Jeanne E. Davidson*, Director; *Patricia M. McCarthy*, Assistant Director; (*Claudia Burke*), Commercial Litigation Branch, Civil Division, United States Department of Justice for Defendant United States.

*Skadden Arps Slate Meagher & Flom, LLP*, (*John J. Mangan*), *Jeffrey D. Gerrish*, and *Robert E. Lighthizer* for Defendant-Intervenor United States Steel Corporation.

*Stewart and Stewart*, (*William A. Fennell*) and *Terence P. Stewart* for Defendant-Intervenor ArcelorMittal Steel USA, Inc.

**BARZILAY, JUDGE:** Plaintiff Corus Staal BV ("Corus") challenges the imposition of antidumping duties by Defendant United States on certain entries of hot-rolled carbon steel ("HRCS") flat products from the Netherlands in an administrative review of an antidumping duty order.[1]  *See Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands; Final Results of Antidumping Duty Administrative Review*, 72 Fed. Reg. 28,676 (Dep't Commerce May 22, 2007) ("*Final Results*"); *Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands; Amended Final Results of the Antidumping Duty Administrative Review*, 72 Fed. Reg. 34,441 (Dep't Commerce June 22, 2007) ("*Amended Results*"); *Issues and Decision Memorandum for the 2004-2005 Administrative Review of Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands; Final Results of Antidumping Duty Administrative Review* (Dep't Commerce May 15, 2007), Pub. R. Doc. ("P.R. Doc.") 111 ("*Issues and Decision Memorandum*").[2]  United States

---

[1] Once an antidumping order has been issued, it may be periodically reviewed. *See* 19 U.S.C. §§ 1673-1673d (2000).  A periodic, or "administrative," review occurs when Commerce, if requested, reviews the order for a twelve month period to update the applicable duty.  19 U.S.C. § 1675(a)(1)(B) (2000).  The order automatically terminates after five years unless (1) Commerce determines that revocation of the antidumping order would likely lead to a continuation or recurrence of dumping, and (2) the ITC determines that revocation would be likely lead to continuation or recurrence of material injury.  § 1675(c)(1) (2000).  This "five-year," or "sunset," review is conducted pursuant to the procedures established under 19 U.S.C. § 1675a (2000).

[2] The *Issues and Decision Memorandum* is also available at http://ia.ita.doc.gov/frn/summary/netherlands/E7-9815-1.pdf.

Steel Corporation ("U.S. Steel") and ArcelorMittal USA, Inc. ("ArcelorMittal") join as

Defendant-Intervenors.  Corus has participated in several proceedings before this Court

contesting the Department of Commerce's ("Commerce") use of zeroing[3] to calculate dumping

margins.[4]  Pursuant to USCIT R. 56.2, Corus moves for Judgment upon the Agency Record

alleging that Commerce did not act in accordance with the law and acted without substantial

evidence when it (1) used zeroing to calculate Corus's weighted-average dumping margin,

(2) instructed Customs and Border Protection ("Customs") to impose antidumping duties on

subject merchandise imported during the fourth period of review when there was no valid

determination of dumping, and (3) conducted a duty absorption inquiry and determined that

antidumping duties related to sales of subject merchandise were absorbed by Corus.  The court

finds that Commerce's actions under (1) and (2) are in accordance with law and supported by

substantial evidence.  However, the court finds that Commerce did not act in accordance with

law as to claim (3).  Therefore, for the reasons stated below, the court denies in part, and grants

in part, Corus's Motion for Judgment upon the Agency Record.

---

[3] "Commerce use[s] a methodology called zeroing . . . whereby only positive dumping margins (*i.e.*, margins for sales of merchandise sold at dumped prices) were aggregated, and negative margins (*i.e.*, margins for sales of merchandise sold at nondumped prices) were given a value of zero."  *Corus Staal BV v. U.S. Dep't of Commerce*, 395 F.3d 1343, 1345-46 (Fed. Cir. 2005) ("*Corus Staal Zeroing*").

[4] *See, e.g.*, *Corus Staal BV v. United States*, 31 CIT ___, 515 F. Supp. 2d 1337 (2007) ("*Corus Staal 1AR*"); *Corus Staal BV v. United States*, 31 CIT ___, 493 F. Supp. 2d 1276 (2007) ("*Corus Staal 5AR*"); *Corus Staal BV v. United States*, 29 CIT 777, 387 F. Supp. 2d 1291 (2005) ("*Corus II*"), *aff'd*, 186 F. App'x. 997 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 3001 (2007); *Corus Staal BV v. U.S. Dep't of Commerce*, 27 CIT 388, 259 F. Supp. 2d 1253 (2003) ("*Corus I*").

# I. Background

## A. The Original Antidumping Order & Subsequent Litigation

On November 13, 2000, U.S. Steel and certain other domestic steel producers petitioned Commerce to determine whether HRCS were being sold in the United States at less than fair value (LTFV) and, if appropriate, levy antidumping duties on the subject merchandise.[5]  *Notice of Initiation of Antidumping Duty Investigations: Certain Hot-Rolled Carbon Steel Flat Products From Argentina, India, Indonesia, Kazakhstan, the Netherlands, the People's Republic of China, Romania, South Africa, Taiwan, Thailand, and Ukraine*, 65 Fed. Reg. 77,568 (Dep't Commerce Dec. 12, 2000).  Commerce conducted an investigation wherein it applied zeroing and ultimately found that Corus dumped the subject merchandise at a rate of 3.06 percent.[6]  *Notice of Final Determination of Sales at Less Than Fair Value; Certain Hot-Rolled Carbon Steel Flat Products From The Netherlands*, 66 Fed. Reg. 50,408, 50,409 (Dep't Commerce Oct. 3, 2001).  On November 29, 2001, Commerce issued an antidumping duty order covering HRCS from the Netherlands.  *Antidumping Duty Order: Certain Hot-Rolled Carbon Steel Flat Products From the Netherlands*, 66 Fed. Reg. 59,565, 59,566 (Dep't Commerce Nov. 29, 2001).

---

[5] "Antidumping laws protect United States industries against the domestic sale of foreign manufactured goods at prices below the fair market value of those goods in the foreign country." *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1372 (Fed. Cir. 2007).

[6] If Commerce and the International Trade Commission ("ITC") determine that a foreign exporter or producer has been or is likely to be selling goods in the United States at LTFV to the detriment of United States producers, Commerce will issue an antidumping order assessing duties on that foreign exporter or producer.  *See FAG Italia, S.p.A. v. United States*, 291 F.3d 806, 809 (Fed. Cir. 2002) (citing §§ 1673-1673d).

The European Communities ("EC") subsequently initiated a proceeding before the World

Trade Organization ("WTO") challenging the United States' use of zeroing to calculate dumping

margins.[7]  *See EC Consultations Request*, WT/DS294/1.[8]  On October 31, 2005, the WTO Panel

concluded that Commerce's use of zeroing in antidumping investigations violated U.S.

obligations under the WTO Antidumping Agreement ("*AD Agreement*") with respect to

antidumping investigations.[9]  *See* Report of the Panel, *United States—Laws, Regulations and*

---

[7] The EC challenged the use of zeroing in fifteen antidumping investigations and sixteen administrative reviews.  The investigation of HRCS imported by Corus was among those challenged before the dispute settlement panel ("WTO Panel").  *See* Request for Consultations by the European Communities, *United States—Laws, Regulations and Methodologies for Calculating Dumping Margins ("Zeroing")*, WT/DS294/1, at 4 (June 19, 2003) ("*EC Consultations Request*").  However, none of the administrative reviews of HRCS were included in the proceeding.  *See id.*

[8] All documents related to WTO dispute WT/DS294, including the reports of the Panel and Appellate Body, are available at http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds294_e.htm .

[9] In its challenge, the EC specifically noted:

[U]nlike in a new investigation, in an administrative review [Commerce] does not compare the average [U.S.] price (export price) to the average home market price (normal value) for the whole investigation period.  Instead, [Commerce's] practice is to compare the [U.S.] net price for each individual [U.S.] transaction to the most contemporaneous monthly average normal value.

The total value of the dumping margin is then calculated by aggregating only the transaction-specific *positive* dumped values and then multiplying the quantity sold in the [U.S.] market for each model by the unit dumped value to arrive at the total dollars dumped. Comparisons of individual [U.S.] transactions to weighted-average monthly normal value that yield *negative* margins are ignored (effectively treated as zero) . . . .

*Methodology for Calculating Dumping Margins ("Zeroing")*, ¶¶ 8.2-8.4, WT/DS294/R (Oct. 31, 2005) ("*Panel Report*").  The WTO Panel stated that the use of the zeroing methodology in investigations violates the *AD Agreement* "as such," and "as applied" in the fifteen specific investigations at issue.[10]  *Id*.  Although the United States appealed certain aspects of the *Panel Report*, the determination concerning zeroing remained unchanged.  *See* Report of the Appellate Body, *United States—Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, ¶ 263, WT/DS294/AB/R (Apr. 18, 2006) ("*EC Zeroing Challenge*").  Moreover, the Appellate Body in *EC Zeroing Challenge* also held that the use of zeroing by Commerce in administrative reviews is impermissible.  *See id*. at ¶¶ 132-35, 263(a)(i).

Accordingly, the United States started the process of implementing the decision outlined in the *Panel Report*.  *Corus Staal 1AR*, 31 CIT at ___, 515 F. Supp. 2d at 1341 (citing *Implementation of the Findings of the WTO Panel in U.S. Zeroing (EC): Notice of Initiation of Proceedings Under Section 129 of the [Uruguay Round Agreements Act ("URAA")]*;

-----

. . . [Commerce's] methodology of aggregating the values of only the positive dumping margins based on the individual transactions means that there is no offset against the positive values at any stage.

*EC Consultations Request*, WT/DS294/1, at 10.

[10] By definition, an "as such" claim "challenges laws, regulations, or other instruments of a [WTO] Member that have general and prospective application, asserting that a Member's conduct—not only in a particular instance that has occurred, but in future situations as well—will necessarily be inconsistent with that Member's WTO obligations."  Report of the Appellate Body, *United States—Sunset Reviews of Anti-Dumping Measures on Oil Country Tubular Goods from Argentina*, WT/DS268/AB/R, at ¶ 172 (Nov. 29, 2004), *available at* http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds268_e.htm.  By contrast, an "as applied" claim is a "challenge[] to a Member's application of a general rule to a specific set of facts"—that is, it contests the way in which a Member implements or enforces a general measure. *See id*. at 3 n.22.

*Opportunity to Request Administrative Protective Orders; and Proposed Timetable and*

*Procedures*, 72 Fed. Reg. 9306 (Dep't Commerce Mar. 1, 2007)). "The administrative

procedures for implementing such a decision are contained in Sections 123 and 129 of the

URAA, codified at 19 U.S.C. §§ 3533(g) and 3538 (2000), respectively."[11] *Corus Staal 1AR*, 31

CIT at ___, 515 F. Supp. 2d at 1341-42 (footnotes omitted); *see also* 19 U.S.C. § 3511 (2000)

(implementing the URAA).  On March 6, 2006, Commerce issued a notice under Section 123 of

the URAA requesting comments from the public on its proposal to implement the *Panel Report*

with respect to the use of zeroing in antidumping investigations.  *Antidumping Proceedings:*

*Calculation of the Weighted Average Dumping Margin During an Antidumping Duty*

*Investigation*, 71 Fed. Reg. 11,189, 11,189-90 (Dep't Commerce Mar. 6, 2006).  In December

---

[11] This Court has previously explained the process by which Congress implements an
adverse WTO Panel decision:

> Congress has established two procedures by which a negative WTO decision may
> be implemented into domestic law.  The first method, a Section 123 proceeding, is
> the mechanism to amend, rescind, or modify an agency regulation or practice in
> order to implement a decision by the WTO that such is inconsistent with U.S.
> treaty obligations.  Section 123 requires the United States Trade Representative
> ("USTR") to consult with appropriate congressional committees, private sector
> committees, and provide for public comment before determining whether and how
> to change an agency regulation or practice. . . .  [*See* § 3533(g)(1).]  The second
> method, a Section 129 proceeding, is discrete.  Section 129 sets forth a procedure
> to implement a [negative] WTO decision with respect to a *specific* [agency]
> determination [that the WTO found does not support an unfair trade order]. . . .
> Importantly, a Section 129 determination is prospective in nature: it becomes
> effective only for unliquidated entries of merchandise that are entered or
> withdrawn from warehouse for consumption on or after the date the USTR directs
> Commerce to implement that determination.  [*See* 19 U.S.C. § 3538(a)(6), (b)(4),
> (c)(1) (2000).]

*Corus Staal 1AR*, 31 CIT at ___ n.8, 515 F. Supp. 2d at 1341-42 n.8 (quoting *Corus Staal 5AR*,
31 CIT at ___ n.2, 493 F. Supp. 2d at 1280 n.2).

2006, Commerce announced that it would no longer use zeroing to calculate dumping margins in

"current and future investigations" as of February 22, 2007.[12]  *See Antidumping Proceedings:*

*Calculation of the Weighted-Average Dumping Margin During an Antidumping Duty*

*Investigation; Final Modification*, 71 Fed. Reg. 77,722, 77,725 (Dep't Commerce Dec. 27, 2006)

("*Section 123 Determination*").  Commerce noted that the modification would apply only to

specific investigations—*i.e.*, investigations involving weighted-average-to-average

comparisons—and, therefore, not to any other types of investigations or administrative reviews.

*Id*. at 77,723-24.

On February 22, 2007, Commerce initiated proceedings pursuant to Section 129 of the

URAA to recalculate dumping margins in each antidumping investigation without zeroing.

*Implementation of the Findings of the WTO Panel in US Zeroing (EC): Notice of Initiation of*

*Proceedings Under Section 129 of the URAA; Opportunity to Request Administrative Protective*

*Orders; and Proposed Timetables and Procedures*, 72 Fed. Reg. 9306, 9306 (Dep't Commerce

Mar. 1, 2007).  In these Section 129 proceedings, Commerce recalculated the dumping margin on

HRCS imported by Corus.  When Commerce issued the final determination of the recalculated

dumping margin, it found the margin to be zero and accordingly revoked the antidumping order

on HRCS.  *Implementation of the Findings of the WTO Panel in US—Zeroing (EC): Notice of*

*Determinations Under Section 129 of the [URAA] and Revocations and Partial Revocations of*

---

[12] The effective date of the *Section 123 Determination* was changed from January 16, 2007 to February 22, 2007.  *Corus Staal 1AR*, 31 CIT at ___ n.9, 515 F. Supp. 2d at 1342 n.9 (citing *Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margins in Antidumping Investigations; Change in Effective Date of Final Modification*, 72 Fed. Reg. 3783 (Dep't Commerce Jan. 26, 2007)).

*Certain Antidumping Duty Orders*, 72 Fed. Reg. 25,261, 25,262 (Dep't Commerce May 4, 2007)

("*Section 129 Determination*").  The USTR directed Commerce to implement its determination

on April 23, 2007.  *Id.*

        While Commerce revoked the antidumping order on HRCS, it expressly rejected Corus's

argument that the results of a Section 129 proceeding apply to entries made prior to the date

USTR directs Commerce to implement the determination.  *Issues and Decision Memorandum* at

12-14.  Commerce noted that the clear, unambiguous language of Section 129 of the URAA and

the *Statement of Administrative Action* ("*SAA*") provides that determinations resulting from a

Section 129 proceeding will not affect entries made before the date of the USTR's direction.[13]

*Id.* at 14.  Commerce emphasized it would instruct Customs to liquidate only those entries of the

subject merchandise that "entered, or [were] withdrawn from warehouse, for consumption *on or*

*after* April 23, 2007 . . . ."  *Section 129 Determination*, 72 Fed. Reg. at 25,263 (emphasis added).

        On April 25, 2007, Corus filed an action with this Court to preclude the application of

antidumping duties on its entries of subject merchandise in the fifth administrative review

covering entries from November 1, 2005 to October 31, 2006.  In that case, Corus challenged the

instructions given by Commerce to Customs to liquidate entries of the subject merchandise made

_____

        [13] The *SAA* states:

        Consistent with the principle that GATT panel recommendations apply only
        prospectively, . . . [Section 129] determinations have prospective effect only.  That is,
        they apply to unliquidated entries of merchandise entered . . . on or after the date on
        which the [USTR] directs implementation. . . .  [E]ntries made prior to the date of
        [USTR's] direction would remain subject to potential duty liability.

*See Uruguay Round Agreements Act, Statement of Administrative Action*, H.R. Rep. No. 103-
316, at 1026 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4313 ("*SAA*").

by Corus during the review period at the as-entered rate, which included antidumping duty

deposits. *See Corus Staal 5AR*, 31 CIT at ___, 493 F. Supp. 2d at 1281. Corus sought a

temporary restraining order ("TRO") and a preliminary injunction to enjoin the liquidation of the

entries. The Court denied the motion for a TRO after Corus failed to show a likelihood of

success on the merits. *See* Order Denying TRO at 1-3, *Corus Staal 5AR*, 31 CIT ___, 493 F.

Supp. 2d 1276 (No. 07-134). The Court also denied Corus's request for a preliminary injunction

and dismissed the action in its entirety for lack of jurisdiction. *Corus Staal 5AR*, 31 CIT at ___,

493 F. Supp. 2d at 1278. The Court further noted that even if it did possess jurisdiction over

Corus's claims, Corus had failed to show a likelihood of success on the merits and, therefore,

would not be entitled to a preliminary injunction.[14] *Id.* at 1286.

On July 19, 2007, Corus challenged Commerce's final determination in the first

administrative review, and sought a TRO and preliminary injunction to enjoin the liquidation of

entries made during that period. *Corus Staal 1AR*, 31 CIT at ___, 515 F. Supp. 2d at 1339-40.

According to Corus, there was no valid determination of dumping because the Section 129

proceedings revoked the antidumping order on HRCS and, therefore, Commerce had no authority

under § 1673 to impose antidumping duties on entries of the subject merchandise made during

---

[14] The Court held that Corus's claim was unlikely to succeed on the merits because
"Section 129 specifically says that any determination made pursuant to that provision applies
*prospectively*, *i.e.*, to merchandise entered or withdrawn from warehouse for consumption *on or
after* the date of implementation." *Id.* at 1286 (citing § 3538(c)(1)). While the Section 129
Determination was implemented on April 23, 2007, the entries in question entered between
November 1, 2005 and October 31, 2006. Thus, the Court noted that the implementation of the
*Section 129 Determination* on April 23, 2007 had no impact on the subject entries because they
entered or were withdrawn from warehouse prior to the revocation date. *See id.* at 1279-80 n.2,
1286.

the review period.  *See id*. at 1343-44.  Although the Court initially granted Corus's request for a

TRO, it denied Corus's motion for a preliminary injunction, holding that Commerce properly

levied antidumping duties on the entries of the subject merchandise made during the review

period in accordance with Section 129 of the URAA and the *Section 129 Determination*.[15]  *See*

*id.* at 1346-47.

## B. The Fourth Administrative Review & Duty Absorption Inquiry

This case concerns the entries of HRCS made by Corus during the fourth administrative

review.[16]  In July 2007, Corus filed a complaint challenging Commerce's (1) use of zeroing in

calculating the dumping margin for entries of HRCS made during the fourth administrative

review, (2) subsequent liquidation instructions issued to Customs that imposed antidumping

duties on the subject merchandise, and (3) duty absorption inquiry and determination.

On December 22, 2005, Commerce announced that it would initiate the fourth

administrative review for entries of HRCS because it had received requests for review pursuant

to § 1675.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews and*

*Request for Revocation in Part*, 70 Fed. Reg. 76,024, 76,024 (Dep't Commerce Dec. 22, 2005)

("*Notice of 4AR*").  Commerce published a notice of Corus's recalculated dumping margin

---

[15] The Court noted that the statutory language is unequivocally clear—revocation orders issued under Section 129 only apply prospectively to unliquidated entries of subject merchandise from the date of the revocation order.  *See id*. at 1346-47.  Moreover, the Court also stated that "this case could reasonably be characterized as a waste of judicial resources.  There is nothing unclear about Section 129 or the [*SAA*] which explains it."  *See* Tr. of Oral Argument at 46, *Corus Staal 1AR*, 31 CIT ___, 515 F. Supp. 2d 1337 (No. 07-270).

[16] The fourth administrative review covers entries of HRCS made between November 1, 2004 and October 31, 2005.

without zeroing pursuant to the general change in policy flowing from the *EC Zeroing Challenge*

decision. *Section 129 Determination*, 72 Fed. Reg. at 25,262. After recalculating the dumping

margin, Commerce determined that the subject merchandise had not been dumped and revoked

the antidumping order on HRCS, effective April 23, 2007. *Id.* However, on May 22, 2007,

Commerce instructed Customs to levy antidumping duties at the assessed rate on entries of

HRCS made by Corus during the review period presumably because they entered before the

effective date of the change in policy. *Amended Results*, 72 Fed. Reg. at 34,441. Using the

zeroing methodology, Commerce calculated a weighted-average dumping margin of 2.26 percent

for HRCS. *Amended Results*, 72 Fed. Reg. at 34,442.

During this period, Defendant-Intervenor U.S. Steel requested that Commerce determine

whether Corus absorbed antidumping duties imposed on HRCS.[17] *See United States Steel*

*Corporation's Request to Commerce with Respect to Duty Absorption* (Jan. 23, 2006), P.R. Doc.

10. Commerce examined whether antidumping duties were absorbed after it received requested

information from Corus and determined that Corus absorbed the antidumping duties on all of its

sales made at LTFV. *See Commerce's Request for Information with Respect to Duty Absorption*

(Jan. 24, 2006), P.R. Doc. 11; *Corus's Response to Commerce's Request for Information with*

*Respect to Duty Absorption* (Feb. 9, 2006), P.R. Doc. 17 ("*Duty Absorption Response*"); *Final*

*Results*, 72 Fed. Reg. at 28,677.

---

[17] Commerce, if requested, may perform a duty absorption inquiry during the second or fourth administrative review after the publication of an antidumping order. Specifically, Commerce "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter . . . if the subject merchandise is sold in the United States through an importer who is affiliated with the foreign producer or exporter." *Agro Dutch Indus. Ltd. v. United States*, 508 F.3d 1024, 1028 (Fed. Cir. 2007) (citing § 1675(a)(4)) ("*Agro Dutch*").

Defendant filed a Motion to Dismiss, which alleged that Corus's challenge to

Commerce's administration of the fourth administrative review under 28 U.S.C. § 1581(i) was

identical to Corus's challenge to the final results of that review under 28 U.S.C. § 1581(c).  In

December 2007, this court denied the Motion to Dismiss without opinion.  Corus subsequently

moved for Judgment upon the Agency Record.

## II. Jurisdiction & Standard of Review

Pursuant to § 1581(c),[18] this Court has exclusive jurisdiction over any civil action

commenced under section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a

(2000).[19]  *See* § 1581(c).  The Court, in reviewing one of Commerce's administrative

determinations, will hold unlawful any determination that is "unsupported by substantial

evidence on the record or otherwise not in accordance with law . . . ."  § 1516a(b)(1)(B)(i).  The

Court will find that Commerce's factual determinations are supported by "substantial evidence"

if there is "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

---

[18] Plaintiff argues that this court has jurisdiction principally under § 1581(i) and, alternatively, under § 1581(c).  Pl. Br. 1-2, 8-9.  The issues here clearly fall within the ambit of our jurisdiction under § 1581(c).  When a party challenges the results of an administrative review of an antidumping order, our Court has jurisdiction over the claim pursuant to § 1581(c).  *See Corus Staal 5AR*, 31 CIT at ___, 493 F. Supp. 2d at 1285.  Only when a party alleges that Commerce acts inconsistently with the results underlying an administrative review of an antidumping order, or in other limited circumstances not applicable here, is § 1581(i) the proper jurisdictional base for its claim.  *See id.*

[19] In relevant part, section 1516a provides for judicial review of a final determination in an administrative review of an antidumping order.  *See* § 1516a(a)(2)(B)(iii).

Whether an administrative determination by Commerce comports with law is prescribed

by the two-step analysis in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467

U.S. 837 (1984) ("*Chevron*").  Under the first step, the Court "considers whether Congressional

intent on the issue is clear . . . ."  *Target Corp. v. United States*, Slip Op. 08-101, 2008 WL

4279535 at *5 (Sept. 18, 2006).  To ascertain Congress's intention,

> the Court employs the traditional tools of statutory construction.  The first and
> foremost tool to be used is the statute's text, giving it its plain meaning . . . . [I]f
> the text answers the question, that is the end of the matter.  Beyond the statute's
> text, the tools of statutory construction include the statute's structure, canons of
> statutory construction, and legislative history.

*Windmill Int'l Pte. v. United States*, 26 CIT 221, 223, 193 F. Supp. 2d 1303, 1305-06 (2002)

(citations & quotations omitted).  "[Only i]f, after employing the first prong of *Chevron*, the

Court determines that the statute is silent or ambiguous with respect to the specific issue, . . .

[then must the Court decide, under the second prong,] whether Commerce's construction of the

statute is [reasonable]."  *Windmill Int'l Pte.*, 26 CIT at 223, 193 F. Supp. 2d at 1306 (citing

*Chevron*, 467 U.S. at 843).  "In determining whether Commerce's interpretation is reasonable,

the Court considers the following non-exclusive list of factors: the express terms of the

provisions at issue, the objectives of those provisions and the objectives of the antidumping

scheme as a whole."  *Id.*

### III. Discussion

Corus alleges that Commerce acted not in accordance with the law and without

substantial evidence when it (1) used the zeroing methodology to calculate Corus's weighted-

average dumping margin, (2) instructed Customs to impose antidumping duties on entries of the

subject merchandise made during the fourth administrative review when there was no valid

determination of dumping, and (3) conducted a duty absorption inquiry and determined that

antidumping duties related to sales of subject merchandise were absorbed by Corus.  The court

finds that Commerce's actions under (1) and (2) are in accordance with law and supported by

substantial evidence.  However, the court finds that Commerce did not act in accordance with

law as to claim (3).

## A. Zeroing and the Liquidation Instructions

The central question underlying the first two issues before this court is whether the

revocation of an antidumping order under Section 129 of the URAA affects prior unliquidated

entries of subject merchandise, *i.e.*, whether a revocation order applies retroactively to entries

that took place prior to the revocation date.  Corus contends that a revocation of an antidumping

order applies to all future liquidations, regardless of the date of entry of imports.  Pl. Br. 22.

As *Corus Staal 5AR* concluded and as several decisions of this Court have affirmed, there

is nothing ambiguous in the statutory text on the issue of whether Section 129 has retroactive

reach.  This matter, therefore, requires the court to give effect to one, clear Congressional intent

pursuant to step one of *Chevron*.[20]  *See Target Corp.*, 2008 WL 4279535, at *5.  The plain

---

[20] Additionally, Corus alleges that Commerce acted unreasonably when it allegedly
interpreted § 3538(c) inconsistently at the WTO and in domestic courts.  Pl. Br. 21-25.  However,
because the language of § 3538(c) is unequivocally clear, this court need not proceed to a
*Chevron* step two analysis of whether Commerce's construction of the statute is reasonable.  We
are guided by the Federal Circuit, which has upheld Commerce's dissimilar interpretation of a
U.S. statute at the WTO, on the one hand, and in domestic courts, on the other.  *See Timken Co.
v. United States*, 354 F.3d 1334, 1343-45 (Fed. Cir. 2004) (where the Court acknowledged the
persuasiveness of a report from the WTO Appellate Body, but refused to overturn Commerce's
longstanding and consistent administrative interpretation).

language of § 3538(c) provides that a Section 129 determination has prospective effect, thereby

applying only to entries made *on or after* the date USTR directs Commerce to implement the

determination.  *See* § 3538(a)(6), (b)(4), (c)(1).  According to § 3538(c), determinations that

> are implemented under [Section 129] shall apply with respect to unliquidated entries of
> the subject merchandise . . . that are entered, or withdrawn from warehouse, for
> consumption *on or after* . . . the date on which [USTR] directs [Commerce] . . . to
> implement that determination.

§ 3538(c), (c)(1)(B).  Moreover, Congress' intent is buttressed by the *SAA*,[21] which unequivocally

states that:

> [c]onsistent with the principle that GATT panel recommendations apply only
> prospectively, [Section 129] determinations . . . have *prospective effect only*.  That is,
> they apply to unliquidated entries of merchandise entered, or withdrawn from warehouse,
> for consumption *on or after* the date on which [USTR] directs implementation. . . .
> [Where] implementation of a WTO report should result in the revocation of an
> antidumping or countervailing duty order, entries made prior to the date of [USTR's]
> direction would remain subject to potential duty liability.

 *SAA*, H.R. Rep. No. 103-316, at 1026, *reprinted in* 1994 U.S.C.C.A.N. at 4313 (emphasis

added).

     In addition to the unambiguous words of § 3538(c) and the insight provided by the *SAA*,

this Court has repeatedly held that Section 129 determinations do not affect entries made prior to

the date that the USTR directs implementation.  In *Corus II*, this Court examined the language of

§ 3538(c) and held that Section 129 determinations do not affect entries made before the

effective date of implementation.  29 CIT at 786, 387 F. Supp. 2d at 1299-1300.  Further, in

---

[21] The *SAA* is technically not legislative history for purposes of a *Chevron* step one
analysis.  However, this Court and the Federal Circuit have repeatedly held that the *SAA* is "an
authoritative expression by the United States concerning the interpretation and application of the
[URAA] . . . in any judicial proceeding in which a question arises concerning such interpretation
or application."  *See Timken Co.*, 354 F.3d at 1338 n.1 (citation & quotation omitted).

*Corus Staal 5AR*, this Court explicitly stated again that § 3538(c) requires Commerce to

implement Section 129 determinations so that they have prospective effect only on "merchandise

entered or withdrawn from warehouse for consumption *on or after* the date of implementation."

31 CIT at ____, 493 F. Supp. 2d at 1286.  Finally, in *Corus Staal 1AR*, this Court stated that only

HRCS from the Netherlands that entered on or after April 23, 2007 are not subject to

antidumping duties.  31 CIT at ___, 515 F. Supp. 2d at 1347 (citing § 3538(c); *Section 129*

*Determination*, 72 Fed. Reg. at 25,261).  In other words, our Court has consistently and

unequivocally held that the revocation of an antidumping duty order does not affect entries made

before the effective date of that revocation.[22]  Therefore, the court must reject Corus's claim that

its entries here are not subject to Commerce's application of the zeroing methodology.

### 1. Zeroing

Corus contends that Commerce's interpretation of 19 U.S.C. § 1677(35)(A)-(B) is

unreasonable and, therefore, not in accordance with law.  First, Corus alleges that Federal Circuit

decisions upholding the use of zeroing are not binding because Commerce's interpretation of

§ 1677(35)(A)-(B)—which prohibits zeroing in investigations, but not administrative

reviews—is inconsistent and, therefore, unreasonable.  Pl. Br. 11-14.  Second, Corus avers that

the unambiguous body of international decisions prohibiting the use of zeroing in administrative

---

[22] That we have addressed this very issue with Plaintiff on at least three separate occasions suggests not only this case is a waste of judicial resources, but also that Corus has failed to exercise a modicum of due diligence and ignored this court's warnings about presenting these claims to this court despite the existence of incontrovertible opposing authority.  *See* Tr. of Oral Argument at 45-47, *Corus Staal 1AR*, 31 CIT ___, 515 F. Supp. 2d 1337 (No. 07-270) ("[P]laintiff petitioned this court for relief despite the existence of incontrovertible opposing authority.  This strikes the court as an example of questionable judgment.").  The statute is clear and, as such, any changes must come in the legislative, rather than judicial, arena.

reviews demonstrates that Commerce's current interpretation of § 1677(35)(A)-(B) is no longer reasonable.[23]  Pl. Br. 14-19.  In light of these decisions, Corus argues that the *Charming Betsy* doctrine compels this court to interpret § 1677(35)(A)-(B) in conformance with the international obligations of the United States and prohibit the use of zeroing in administrative reviews.[24]  Pl. Br. 19-20.

The Federal Circuit has noted that the words of § 1677(35)(A)-(B) do not directly speak to the issue of giving negative dumping margins a value of zero, *i.e.*, zeroing.[25]  *See Timken Co.*, 354 F.3d at 1341-42.  Thus, under the second step in the *Chevron* analysis, we must evaluate whether Commerce's interpretation of the statute is based on a permissible statutory construction.

---

[23] *See, e.g.*, Appellate Body Report, *European Communities—Anti-dumping Duties on Imports of Cotton-Type Bed Linen from India*, WT/DS141/AB/R (Mar. 12, 2001) (rejecting EC's use of zeroing); Appellate Body Report, *United States—Sunset Review of Anti-dumping Duties on Corrosion-Resistant Carbon Steel Flat Products from Japan*, WT/DS244/AB/R (Dec. 15, 2003); Appellate Body Report, *United States—Final Dumping Determination on Softwood Lumber from Canada*, WT/DS264/AB/R (Aug. 11, 2004); *EC Zeroing Challenge*, WT/DS294/AB/R (Apr. 18, 2006); Appellate Body Report, *United States—Measures Relating to Zeroing and Sunset Reviews*, WT/DS322/AB/R (Jan. 9, 2007); Report of the Panel, *United States—Laws, Regulations and  Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/RW (Dec. 17, 2008).

[24] Specifically, Corus alleges that the *Charming Betsy* canon of claim construction does not permit the United States to interpret the underlying domestic statute in such a way that makes it inconsistent with the *AD Agreement* unless no other statutory construction remains.  Pl. Br. 19; *see Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch.) 64, 118 (1804) ("*Charming Betsy*") (suggesting that courts should interpret domestic law, whenever possible, in a manner consistent with the international obligations of the United States).

[25] Section 1677(35)(A) defines the term "dumping margin" as "the amount by which normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A).  Section 1677(35)(B) defines the term "weighted average dumping margin" as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer."  § 1677(35)(B).

*See Chevron*, 467 U.S. at 843.  The Federal Circuit has repeatedly found Commerce's use of

zeroing in administrative reviews to be reasonable.  *See NSK Ltd. v. United States*, 510 F.3d

1375, 1380 (Fed. Cir. 2007) ("'we . . . refuse to overturn Commerce's zeroing practice based on

any ruling by the WTO or other international body unless and until such ruling has been adopted

pursuant to [§ 3533(g)].'" (quoting *Corus Staal Zeroing*, 395 F.3d at 1349)); *Corus Staal BV v.

United States*, 502 F.3d 1370, 1375 (Fed. Cir. 2007) (holding that Commerce's policy of zeroing

is reasonable and using Commerce's *Issues and Decision Memorandum* in the fourth

administrative review, at issue in this case, to support its conclusion); *Timken Co.*, 354 F.3d at

1344.  In other words, Commerce's interpretation of § 1677(35)(A)-(B) is reasonable.

Further, Commerce has not prohibited the use of zeroing in administrative reviews

pursuant to § 3533(g).  The *Section 123 Determination* states only that Commerce will no longer

permit the use of zeroing in investigations involving weighted-average-to-average comparisons.

71 Fed. Reg. at 77,723-24 ("[Commerce] proposed only that it would no longer make average-to-

average comparisons in *investigations* without providing offsets for non-dumped comparisons.

[Commerce] made no proposals with respect to any other comparison methodology or any other

segment of an antidumping proceeding . . . .") (emphasis added).  Moreover, even if the *Section

123 Determination* were to apply to administrative reviews, the entries at issue in the current

review would be unaffected by the *Section 129 Determination* that revoked the antidumping

order on HRCS.  Because the *Section 129 Determination* has prospective effect only, entries

made before the implementation date of April 23, 2007, like those during the fourth

administrative review, would not be affected.  Consequently, Commerce's interpretation of

§ 1677(35)(A)-(B), which permits the use of zeroing in administrative reviews, is reasonable and in accord with law.[26]

      There is no doubt that WTO Panel and Appellate Body decisions explicate the duties and obligations owed by member nations under WTO compacts like the *AD Agreement*, but the international agreements are not identical to the corresponding domestic statutes and are not subject to identical rules of interpretation.  As the Federal Circuit has repeatedly noted, WTO decisions are "'not binding on the United States, much less this court.'"  *Corus Staal Zeroing*, 395 F.3d at 1348 (quoting *Timken Co.*, 354 F.3d at 1344).  If statutory provisions of the United States are inconsistent with the *AD Agreement*, it is strictly a matter for Congress.[27]  *See id*.  Thus, the *Charming Betsy* doctrine does not apply in this case given the clear requirements of § 3533(g) and Federal Circuit precedent.[28]

### 2. Liquidation Instructions

      Corus alleges that Commerce acted unlawfully when it instructed Customs to assess antidumping duties on entries of the subject merchandise made during the fourth administrative

---

[26] The issue of whether the *Section 123 Determination*, which permits the use of zeroing in administrative reviews but not weighted-average-to-average investigations, is in accord with law and supported by substantial evidence is not before the court at this time.

[27] Specifically, the USTR, an arm of the Executive branch, works in consultation with various congressional and executive bodies and agencies to determine whether and to what degree to implement WTO reports and determinations.  *See id*. (citing §§ 3533(f)-(g), 3538).

[28] Plaintiff has petitioned the Federal Circuit for relief based on the very same claim—that is, a growing body of international decisions requires the Federal Circuit to employ the *Charming Betsy* canon of claim construction to harmonize domestic law with the international obligations of the United States.  Corus made such a claim despite the existence of opposing authority and was denied relief.  *See Corus Staal Zeroing*, 395 F.3d at 1347-49.

review because there was no valid finding of dumping.  Pl. Br. 21-30.  When a dumping order is

revoked because of a change in law, Corus contends that the new law is to apply in all future

liquidations, regardless of the date of entry of the subject merchandise.  Pl. Br. 22.  When

Commerce recalculated Corus's dumping margin using a non-zeroing methodology and found

that under the new procedure Corus did not have a positive dumping margin for HRCS, it

revoked the antidumping order on April 23, 2007.  *Section 129 Determination*, 72 Fed. Reg. at

25,262.  Corus alleges that the *Section 129 Determination*, which Commerce issued before the

*Final Results* and the *Amended Final Results*, is the controlling legal authority that guides

Commerce in recalculating the dumping margin on HRCS.  Accordingly, because there was no

valid finding of dumping pursuant to the *Section 129 Determination*, Corus avers that Commerce

erred when it instructed Customs to impose antidumping duties on entries of the subject

merchandise made during that review period.

      Section 1673 provides that antidumping duties are imposed on subject merchandise

where (a) the foreign merchandise is, or is likely to be, sold in the United States at LTFV, such

that it causes (b) an industry in the United States to suffer a material injury, or to be threatened

with a material injury.  *See* § 1673(1)-(2).  In essence, to levy antidumping duties on subject

merchandise, Commerce must show that the goods were dumped in the United States, and the

ITC must demonstrate the existence, or cognizable threat, of a material injury to a domestic

industry that is caused by the merchandise at issue.  *See id*.  Without both statutory requirements,

no antidumping duty is proper.

In an administrative review, Commerce recalculates the dumping margin to update the applicable duty.  § 1675(a)(1)(B).  The injury, or threatened injury, to the domestic industry is presumed in an administrative review, and is not reexamined until the sunset review.  § 1675(c)(1).  Here, Commerce determined that HRCS were dumped in the United States during the fourth administrative review.  *Final Results*, 72 Fed. Reg. at 28,677.  Using the zeroing methodology, Commerce calculated a weighted-average dumping margin of 2.26 percent for Corus.  *Amended Results*, 72 Fed. Reg. at 34,442.

Corus's contention that Commerce's use of zeroing in the fourth administrative review is unlawful contravenes applicable precedent.  The Federal Circuit has repeatedly upheld Commerce's use of zeroing as reasonable when calculating the dumping margin in administrative reviews.  *See, e.g.*, *NSK Ltd.*, 510 F.3d 1375; *Corus Staal BV*, 502 F.3d 1370; *Corus Staal Zeroing*, 395 F.3d 1343; *Timken Co*, 354 F.3d 1334.  Moreover, the *Section 129 Determination* has no effect on the entries at issue here.[29]  That Commerce used zeroing to calculate the dumping margin for Corus's entries of HRCS made during the fourth administrative review does not render Commerce's affirmative dumping determination unlawful.  Thus, Commerce did not err when it instructed Customs to impose antidumping duties on Corus's entries of HRCS given the valid determination of dumping and assumption of injury at the time these entries were made.

---

[29] This court must note yet again that a Section 129 determination affects only those entries made *on or after* the date on which the USTR directs Commerce to implement the determination.  *See* § 3538(c)(1)-(2); *SAA*, H.R. Rep. No. 103-316, at 1026, *reprinted in* 1994 U.S.C.C.A.N. at 4313.  It is undisputed that the entries at issue entered before the date on which the antidumping order was revoked, April 23, 2007.  *See Notice of 4AR*, 70 Fed. Reg. at 76,025.

Finally, Corus's reliance on *Parkdale Int'l*, in which the court examined whether a change in policy was impermissible retroactive, is misplaced. *See Parkdale Int'l v. United States*, 475 F.3d 1375, 1378-79 (Fed. Cir. 2007). The plaintiff had argued that the application of Commerce's new reseller rule to its imports, which subjected the plaintiff to the higher, "all-other" rate of antidumping duties, was impermissibly retroactive. *Id.* The Federal Circuit held that it was not, based in part on the principle that liquidation is the determinative event for the retroactive analysis. *Id.* at 1379. In this case, however, Commerce's change in methodology is prospective only, not retroactive.[30] Corus mistakes *Parkdale Int'l* for a talisman that requires this court to retroactively apply a change in methodology whenever retroactivity is not barred. *Parkdale Int'l* stands for no such proposition, but rather merely recognizes that Courts must consider several factors when assessing whether the retroactive application of a change in methodology in the antidumping context is permissible. *Id.* at 1378-80.

In summary, Commerce did not err when it used the zeroing methodology to calculate Corus's weighted-average dumping margin, and the liquidation instructions issued to Customs were based on a valid dumping determination. The court finds Commerce's actions at issue to be in accord with law and supported by substantial evidence.

---

[30] The *Section 123 Determination* unambiguously states that it would only apply to specific *current and future investigations*, namely, investigations involving weighted-average-to-average comparisons, and not to any other type of investigation or administrative review. *See* 71 Fed. Reg. at 77,723-24. Additionally, the language of Section 129 and the *SAA* is clear: determinations under that provision do not apply retroactively to unliquidated entries made before the implementation date, like Corus's entries of HRCS made during the fourth administrative review. *See* § 3538(c)(1)-(2); *SAA*, H.R. Rep. No. 103-316, at 1026, *reprinted in* 1994 U.S.C.C.A.N. at 4313.

## B. Duty Absorption

Corus alleges that Commerce did not satisfy the statutory criterion that would permit it to conduct a duty absorption inquiry and erred in finding that Corus absorbed the antidumping duties on HRCS. Pl. Br. 31-39. Corus notes that § 1675(a)(4) authorizes Commerce to conduct a duty absorption inquiry only if there exists an importer who is affiliated with the producer or exporter of the subject merchandise. Pl. Br. 31. It is undisputed that Corus is the producer and exporter, as well as the importer, of the subject merchandise. *Duty Absorption Response*, P.R. Doc. 17 at 2, 5. Accordingly, Corus avers that the Federal Circuit decision in *Agro Dutch*, which found that an entity cannot be affiliated with itself, precludes Commerce from conducting a duty absorption inquiry or finding that Corus absorbed antidumping duties. Pl. Br. 33-35.

Absorption occurs when a producer or exporter of subject merchandise reimburses an affiliated importer for the cost of antidumping duties. Section 1675(a)(4) provides that Commerce may proceed with a duty absorption inquiry[31] during any review

> initiated [two] years or [four] years after the publication of an antidumping duty order under § 1673e(a) . . . , if requested, [and] shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject

---

[31] "[T]he purpose of a duty absorption inquiry is to ensure that foreign exporters subject to antidumping orders do not undermine the purpose of the antidumping laws by absorbing the duty rather than passing the duty on to the United States purchasers in the form of higher prices." *Agro Dutch*, 508 F.3d at 1028 (citation & quotation omitted). "A finding of duty absorption . . . does not affect the duty imposed as a result of such review. . . . Rather, Commerce reports the findings made during the absorption inquiry to the ITC for consideration during the sunset review." *Id*. at 1028 (citation omitted). "[T]he consequence of a finding of duty absorption by Commerce is that the anti-dumping order is less likely to be revoked as a result of a sunset review, as such a finding [would] indicate[] that the foreign producer or exporter would be able to market more aggressively should the order be revoked . . . ." *Id*. at 1028 (citations & quotations omitted).

merchandise is sold in the United States *through an importer who is affiliated with such foreign producer or exporter.*

§ 1675(a)(4) (emphasis added). The Federal Circuit has found the terms "affiliated" and "affiliated persons," defined under 19 U.S.C. § 1677(33) (2000),[32] to connote the presence of two or more entities. *See Agro Dutch*, 508 F.3d at 1031. To be sure, "[e]very dictionary . . . defines [the term "affiliated"] such that the concept of a person or organization affiliating with itself is excluded or, at the very least, highly implausible." *Id.* As such, "an organization can no more affiliate with itself than a man can adopt himself as his own son." *Id.*

During the fourth administrative review, Commerce conducted an inquiry to determine whether Corus absorbed antidumping duties. Commerce rejected Corus's argument that it could not affiliate with itself as both the producer or exporter and importer of the subject merchandise

_____

[32] Pursuant to § 1677(33), the following persons are considered to be "affiliated" or "affiliated persons":

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> (B) Any officer or director of an organization and such organization.
> (C) Partners.
> (D) Employer and employee.
> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
> (G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

§ 1677(33).

and, therefore, that the inquiry was unlawful.  *Issues and Decision Memorandum* at 24.  After the

*Final Results* and *Amended Results* were issued, the Federal Circuit held that § 1675(a)(4)

permits a duty absorption inquiry by Commerce only when the subject merchandise is sold

through a separate, affiliated importer.[33]  *See Agro Dutch*, 508 F.3d at 1031-33.  Accordingly, the

Court in *Agro Dutch* found that Commerce erred when it conducted a duty absorption inquiry

because the producer or exporter and importer were the same entity.  *Id*. at 1033.

In the instant challenge, Corus, like the plaintiff in *Agro Dutch*, is the producer or

exporter and importer of the subject merchandise, *i.e.*, the same entity.  *Duty Absorption*

*Response*, P.R. Doc. 17 at 2, 5.  Moreover, Corus did not sell the subject merchandise to a

separate, affiliated importer in the United States during the fourth administrative review.  *Id*. at

5-6.  In other words, there was no importer affiliated with Corus.  Because of the absence of an

affiliated importer, Commerce erred when it (a) initiated the duty absorption inquiry and

(b) found Corus absorbed the antidumping duties imposed on HRCS.  Commerce must therefore

render a decision consistent with the Federal Circuit's interpretation of § 1675(a)(4) in *Agro*

*Dutch*.  Defendant has acknowledged as much and requested a voluntary remand on this issue.[34]

Def. Br. 22-23.

---

[33] In *Agro Dutch*, the sole contention on appeal was whether Commerce was empowered to conduct a duty absorption inquiry when the producer or exporter and importer of the subject merchandise was the same entity—that is, whether an entity could be "affiliated" with itself.  *See* 508 F.3d at 1028-29.

[34] ArcelorMittal respectfully disagrees with the Federal Circuit's conclusion in *Agro Dutch* and reserves its right to challenge any reversal of Commerce's finding of duty absorption.  Def.-Intervenor ArcelorMittal Br. 25-26.  Defendant-Intervenor U.S. Steel did not discuss the issue of duty absorption.

## IV. Conclusion

For the reasons stated herein, Plaintiff's Motion for Judgment upon the Agency Record is DENIED in part and GRANTED in part.

The court hereby

AFFIRMS Commerce's use of zeroing to recalculate Corus's dumping margin during the subject administrative review; and

AFFIRMS Commerce's instructions to Customs to levy antidumping duties on entries of the subject merchandise made by Corus during the fourth administrative review; and

GRANTS Plaintiff's Motion for Judgment upon the Agency Record with respect to the issues underlying the duty absorption inquiry. Specifically, the court finds that Commerce did not act in accordance with law when it (a) initiated the duty absorption inquiry and (b) found Corus absorbed the antidumping duties imposed on the subject merchandise.

Accordingly, this court remands the issues underlying the duty absorption inquiry and determination to Commerce so that it may issue a decision consistent with the Federal Circuit's interpretation of § 1675(a)(4) in *Agro Dutch*.


Dated: December 29, 2008                           /s/ Judith M. Barzilay
       New York, NY                              Judith M. Barzilay, Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk